UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


UNITED STATES OF AMERICA *
            V.            *    Case No:  2:14-cr-00030-wks-1
MICHAEL KARLBERG        *


SENTENCING
FEBRUARY 23, 2015
BURLINGTON, VERMONT


BEFORE:
      THE HONORABLE WILLIAM K. SESSIONS III
      District Judge

APPEARANCES:

      Barbara A. Masterson, Esq., Assistant United States
Attorney, P.O. Box 570, Burlington, VT  05402-0570; Attorney
for the Plaintiff.

      David L. McColgin, Esq., Office of the Federal Public
Defender, 126 College Street, Suite 410, Burlington, VT  05401;
Attorney for the Defendant.


Court Reporter:  JoAnn Q. Carson, RMR, CRR


CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802/800) 863-6067
E-MAIL:  Info@capitolcourtreporters.com

1          COURTROOM DEPUTY:  This is case number 14-30 United

2   States of America versus Michael Karlberg.  The Government is

3   present through Assistant United States Barbara Masterson.  The

4   Defendant is present in the courtroom with his attorney David

5   McColgin.  The matter before the Court is sentencing.

6          THE COURT:  Okay.  Mr. McColgin, have you received a

7   copy of the presentence report --

8          MR. McCOLGIN:  Yes, Your Honor.  I have.

9          THE COURT:  -- the report on Mr. Karlberg?

10          MR. McCOLGIN:  I have.

11          THE COURT:  Did you see any factual mistakes in the

12   report?

13          MR. McCOLGIN:  No.

14          THE COURT:  All right.  Mr. Karlberg, have you read

15   the report?

16          MR. KARLBERG:  Yes, Your Honor.

17          THE COURT:  Did you go over the report with Mr.

18   McColgin?

19          MR. KARLBERG:  Yes, Your Honor.

20          THE COURT:  Did you see any mistakes in the report?

21          MR. KARLBERG:  No, Your Honor.

22          THE COURT:  Okay.  Ms. Masterson, any errors?

23          MS. MASTERSON:  No, Your Honor.

24          THE COURT:  All right.  I've read the presentence

25   report.  I've read the sentencing memoranda, both the

1  Government and the Defense.  I've read both psychological

2  reports.  The attached letters.  There are no guideline

3  application issues.

4      Because of the nature of this particular offense the

5  production of pornography guideline has to be applied.  The

6  guideline range is in fact 10 years because of the maximum

7  penalty for this particular offense.  So the Defense is

8  requesting a non-guideline sentence, and I don't think the

9  Government -- the Government has no objection to that.

10      So how do you wish to proceed?  This is, I will say, one

11  of the most extraordinary presentence reports I have read in 20

12  years on the bench frankly.  Ms. Masterson, I appreciated your

13  recommendation.  I don't see any alternative, you know,

14  frankly, but --

15          MS. MASTERSON:  Right.  Well it does create the

16  interesting question, though, of if the Court chooses not to

17  impose any incarcerative sentence right now and go straight on

18  supervised release what happens if he violates.  I mean the

19  usual sanction is putting somebody in jail, and at this time

20  that doesn't seem to be a tenable or a viable option, but we

21  are here today which is why I think we can worry about that

22  later on.

23      I do think very strongly that lifetime supervision is

24  appropriate here.  As I indicated in my papers he is always

25  going to be autistic, Your Honor, and that's not going to

1  change.  The only thing that will change will be the ability to

2  which he can engage with other people.  Right now that -- his

3  inability to engage and have relationships and basically have

4  contact with people means that he's low risk for a contact

5  offense because he just doesn't have the skills to engage with

6  somebody on a physical direct nature, but he is definitely at

7  risk for the online offenses and that's always going to be the

8  case, and frankly as he gets more treatment and is able to

9  engage one-on-one with people I think his risk of engaging in a

10  contact offense will be higher.  It will increase as he is more

11  comfortable around people.

12          The only way that we can truly protect the public from the

13  risk that Mr. Karlberg poses either online or in person is

14  lifetime because as I started to say he is autistic and that's

15  just the way that his brain is wired and that's not going to go

16  away, and he's sexually attracted to children and that's the

17  way his brain is wired, and the combination of the two means

18  it's going to last for his entire life, and just because he's

19  70 he's always going to be sexually attracted to children and

20  he's going to have the limited engagement powers always because

21  --

22          THE COURT:  Let me -- I mean this is obviously a

23  delicate issue because you know the children here are 13, 15

24  years old.  He has so many emotional issues.  One of them

25  relates to his level of functioning and, you know, generally --

1 I didn't see it here, but generally you'll see reports in which

2 the level of functioning is assigned an age, and it could very

3 well be that his level of functioning is of a 13 to 15-year-old

4 in light of his intellectual capacity, and then you're in a

5 situation really of not necessarily an obsession with children.

6 It becomes more of a peer kind of thing which then suggests

7 that 20 years down the road where are we?

8 I mean I don't know.  I didn't -- I was looking in the

9 psychological reports for something which, you know, related

10 his disabilities, in particular the borderline intellectual

11 capacity, to a maturity level, and so, you know, physically

12 he's 26-years-old.  Maturity-wise I don't know what he is

13 frankly but --

14 MS. MASTERSON:  Well and I appreciate the Court's

15 point, but let's think about it -- let's throw it into a

16 different light.  Let's say in 20 years he is still functioning

17 at an emotional or intellectual capacity of a 13-year-old.

18 He's going to still be attracted to 13-year-olds.  What I'm

19 concerned about is what will happen to the 13-year-olds that

20 he's communicating with.  I mean he may -- may still see them

21 as peers and that sort of thing but they are not, but they are

22 going to be victimized by him.

23 We have a number of victims that he has already -- that

24 he's already had the contact with.  So we know what he's

25 capable of and it doesn't matter how old he is even if that's

1  his target age group.  They are the ones that are going to be

2  damaged when they engage with him, and that is what we have to

3  protect against.

4  　　　　THE COURT:  Well right.  I just -- but -- so maybe

5  it's not -- maybe it's not important to try to translate his

6  intellectual capacity to age if you assume that as he gets

7  older his intellectual capacity would remain at the equivalent

8  age of a 13-year-old, but it could very well become older.

9  　　　　MS. MASTERSON:  It's possible, but I -- in some

10  respects that's -- I don't know what's going to happen.  I

11  think that is possible.

12  　　　　THE COURT:  I want to say the other thing that I had

13  thought about is, you know, to bar use of computers, but I

14  think the Second Circuit has pretty clearly said that you -- in

15  today's world you cannot bar somebody from use of computers.

16  So I guess the standard conditions in regard to computer use

17  are needed to protect the community.

18  　　　　MS. MASTERSON:  Well I think there's two points to

19  that, Your Honor.  I mean for Mr. Karlberg's unique situation I

20  think at this time a computer is a lifeline for him.  It's a

21  way of engaging in ways that he's not capable of doing at this

22  point.

23  　　　If he were to violate, I think then an appropriate

24  response would be to bar all computer use.  I think that would

25  be appropriate because then we would have a demonstrated abuse

1  of that, and I would happily defend the Court if you did that.

2          THE COURT:  Oh you would, happily?

3          MS. MASTERSON:  Here's another point.

4          THE COURT:  I don't know.  The Public Defenders

5  Office has gotten a couple of reversals recently and so that

6  they are sort of on a wave.

7          MS. MASTERSON:  Well we have had -- yes, there have

8  been many appeals back and forth, Your Honor.

9          THE COURT:  Right.

10          MS. MASTERSON:  I want to make -- if I may, I want to

11  make another important point though, Your Honor, is that

12  regardless of how Mr. Karlberg got on to the computer, however

13  it is he learned to do what he did, he figured out how to

14  manipulate little girls into masturbating for him on camera and

15  then he secretly recorded it.  He did this with a number of

16  people, and the conduct that he did with the little girl in

17  Texas is so chilling to me because -- and the Court read about

18  it in the PSR where he was chatting with her, got her to sext

19  him, flash a picture of her breasts for him, and then she gets

20  freaked out.  She unfriends him and then he like figured out,

21  and he did this on his own and this is where there is a total

22  disconnect in the Government's view between his level of

23  intellectual functioning and what he was able to do in that

24  situation because he then went, adopted the persona, like

25  hacked, figured out the persona of a friend of hers, and then

1  sent a friend request using that false identity so that that

2  little girl would think she was friending a real friend, and

3  then after that he reveals it's me and now you really need to

4  do what I ought to do.

5      It's at that point that she told her parents and this

6  whole thing unraveled for him.  But that level of manipulation,

7  deception, coercion, I mean I -- it's amazing that he's an

8  individual and I -- that has a hard time articulating anything,

9  but you put him behind a keyboard and he's an absolute bully,

10  and he's a mean, mean person whose victimized a number of

11  little girls, and it's what he did to them and what -- shows

12  what he is absolutely capable of doing and will be capable of

13  doing that for his entire life because of his autism, and that

14  is why we think very strongly that he needs to be on lifetime

15  supervision.

16      THE COURT:  Well so he's on lifetime supervision,

17  that is always subject to Court review.  If the probation

18  officer recommends that he be taken off supervision after a

19  period of time, you would recognize that the Court could do

20  that.

21      MS. MASTERSON:  I do recognize that, but I think that

22  right now we don't know where he's going to be in 20 years or

23  however long it's going to take.  If we're in the same

24  situation where -- because one problem that we have in this

25  case is that he did not have access to treatment during the

1  first 26 years or 25 years of his life.  It was not until after

2  he was caught in this case that his diagnosis became apparent.

3  I think it was in 2012 when he was actually appropriately

4  diagnosed and then he started getting the services, but we

5  missed a huge window of opportunity to get him -- to bring him

6  along in his functioning capability and we're not there yet,

7  and so is he stuck where he is, how much growth is he going to

8  be able to accomplish because we missed so much time early on.

9      We don't know that which is why I think we -- given the

10  level of harm that he has perpetuated on little girls and that

11  he's capable of perpetuating on little girls or inflicting on

12  little girls that's why I think we need to play it safe and

13  impose a lifetime.  If there is progress where he can actually

14  -- he can function and not be a potential victimizer, we can

15  evaluate it at that time, but as another point, though, Your

16  Honor, that I think is important is that we know that he

17  persisted in this activity even after being scared by the

18  police because the Court will recall that after --

19          THE COURT:  He was called by the Austin police

20  officer.

21          MS. MASTERSON:  Exactly and he had that long

22  conversation with him.  He didn't turn himself in.  Instead he

23  decompensated and had a meltdown in February of '12 and was put

24  into the psychiatric hospital for a period of time so that he

25  could recover, and so we know that that timing is there, but

1   then thereafter I mean he's talked to the police about what

2   he's doing, he has an appropriate reaction which is to be very

3   upset about it, but then he goes right back -- once he kind of

4   recovers he goes right back to work.

5           I wrote down a couple of notes.  He had said -- it was on

6   April 22nd that Detective Raymond interviewed Mr. Karlberg and

7   took the computer and law enforcement really got involved and

8   that's about two months after he had the call from the Texas

9   officer, but the day before he was interviewed by Matt Raymond

10  he had sent a message to that same Texas girl, and about 10

11  days or 12 days before Matt Raymond came in is when he engaged

12  in a very long sexually explicit chat with a minor when he was

13  pretending to be a 14-year-old.

14          So he has persisted in this criminal activity, highly

15  inappropriate activity, even after being completely scared by

16  law enforcement contact, and there's a very short time period

17  afterwards that -- I mean it was within two months of the call

18  with the police officer that he's right back in the game.

19              THE COURT:  Well that's interesting because when he

20  goes to Lyndon State -- I mean this reads like a novel.  When

21  he went to Lyndon State he decompensated quickly within a very

22  short period of time.  He's interviewed by many people there

23  apparently and he does not remember a single interview, right.

24  So to what extent does he remember what actually was -- was a

25  part of that confrontation by a law enforcement officer.  I

1  don't know.  Okay.  Well --

2          MS. MASTERSON:  And that cuts both ways I think

3  because if he remembers and he's still going at it, then that's

4  a problem.  But if he doesn't remember, that's possibly an even

5  bigger problem because then where is the control, the external

6  control that would cause him to change his behavior.

7          THE COURT:  But on the other hand the psychiatrist

8  has said that he reacts very well to supervision, to being told

9  exactly what to do, he's very responsive in that kind of way,

10  and if supervision is appropriate so that level of control is

11  managed, then his risk of recidivism is reduced which suggests

12  that there should be a very lengthy period of supervision.

13          MS. MASTERSON:  And I think it should be at this

14  point for the rest of his life.  Thank you, Your Honor.

15          THE COURT:  Okay.  All right.  Mr. McColgin.

16          MR. McCOLGIN:  Thank you, Your Honor.  Clearly this

17  is a very serious offense.  It's extraordinarily unusual

18  factually, as Your Honor has already noted, and I think what

19  really stands out in terms of the psychosexual evaluation is

20  the fact that his autism, even though it appears to have

21  contributed to the offense, it also adds a protective aspect to

22  it that the Government has already noted, which is that by his

23  very nature of not wanting to have contact with people he's

24  very unlikely to have a contact offense.

25          So that what remains is the risk of some online contact as

1  in the facts of this case, and that can be managed and it has

2  been very successfully managed ever since Mr. Karlberg has been

3  arrested.  His computers were removed.  He lost the computers.

4  He has had access to a computer but only to his mother's

5  computer and his mother has been very strict with him.  Has

6  made it clear that he can only use that computer when -- at the

7  kitchen table when she is there.  He does not have the password

8  to that computer.  So he can't use it unless she is there and

9  opens it up first and gets it started for him, and so his

10 access to the computer at this point is very tightly controlled

11 and very limited, and there haven't been any problems since he

12 has been under that level of supervision.

13      If you combine that with supervision from probation in

14 terms of whatever sorts of controls they would want to put on

15 the computer to be able to list exactly what internet sites

16 have been visited, any risk of reoffense is greatly reduced,

17 and I think Dr. Guidry's conclusion is a warranted conclusion

18 which is that any risk can be appropriately managed in the

19 community.

20      In terms of length of supervision I think that lifetime

21 supervision is excessive.  He's just at this point over the

22 last year been getting the treatment that he needs.  He's

23 getting --

24          THE COURT:  Well let me suggest another alternative,

25 that the Court impose a lifetime of supervision but then make a

1  recommendation that the length of supervision be reviewed let's

2  say at 20 years and every five-year period thereafter.  So that

3  if after that lengthy period of time a probation officer thinks

4  that continued supervision is not warranted based on his

5  changed circumstances, then the probation officer can petition

6  the Court to remove it.

7          MR. McCOLGIN:  That would certainly --

8          THE COURT:  We don't know what's going to happen

9  obviously in 20 years.

10          MR. McCOLGIN:  We don't know, but he is --

11          THE COURT:  I don't think you will be here and I

12  certainly will not.  So to build in some sort of review process

13  so that, you know, he's not forced into supervision when it's

14  no longer needed, but on the other hand if he's benefitting by

15  supervision and society's benefitting by supervision, then the

16  probation officer would have the ability to continue it.

17          MR. McCOLGIN:  So perhaps a review of the supervised

18  release every five years.

19          THE COURT:  Well not for a while, but --

20          MR. McCOLGIN:  Well if it's going to be reviewed, I

21  would suggest every five years and then -- I would suggest not

22  waiting 20 years for a review of his supervision, but --

23          THE COURT:  Okay.  Well as I said I'm not going to be

24  here in 20 years, and at least I would like to have the impact

25  of suggesting to probation somewhere down the road, officers

1 whom I will not know at that point, that I felt strongly that

2 there should be a very lengthy period even before there's a

3 review, but anyway that's the concept that there would be some

4 level of flexibility.

5        MR. McCOLGIN: I appreciate that, and, you know, I

6 think certainly having it built into that concept the notion

7 that if he's doing well probation could be or supervised

8 release could be terminated at that point is appropriate. I

9 would still suggest that 10 years of supervision would be

10 sufficient for somebody getting treatment, for somebody where

11 the risks can be so readily managed. I would suggest the 10

12 years would be sufficient, but if Your Honor is inclined to

13 impose lifetime, I certainly support the notion of building

14 into that a periodic review, and I would recommend every five

15 years.

16        THE COURT: All right. Okay. Does your client wish

17 to address the Court?

18        MR. McCOLGIN: I've spoken to him about that, Your

19 Honor. He indicated to me no, but if you would like to address

20 him directly on that issue --

21        THE COURT: Mr. Karlberg, would you like to say

22 anything at this point?

23        MR. KARLBERG: No, Your Honor.

24        THE COURT: How are things going at home?

25        MR. KARLBERG: Okay.

1           THE COURT:  Do you like your probation officer?

2           MR. KARLBERG:  Yeah.

3           THE COURT:  Okay.  All right.  I really appreciate

4  the thought that's gone into this recommendation from both

5  sides, in particular the psychological evaluations that suggest

6  that lengthy period of supervision is the appropriate sentence.

7           The Court will grant the Defendant's request for a

8  departure based upon extraordinary mental condition and also a

9  non-guideline sentence under 3553(a), and I want to say that I

10 agree with the recommendation.  My sense is that Mr. Karlberg

11 suffers from a whole series of disabilities, that if he was in

12 a prison environment that he would decompensate and become

13 psychotic within in my estimate five minutes.  I was thinking

14 perhaps one minute, but once he's going through processing that

15 would be more than he could psychologically handle, and that

16 he's done well for this lengthy period of supervision.

17          There are signs that are very positive that he could be

18 controlled so that he would not pose a risk.  He's certainly

19 not a risk of any physical contact because he has difficulty

20 having any kind of physical contact with other people, but he

21 does pose a significant risk in the online setting to young

22 people.  So, therefore, my sense is that a lifetime period of

23 supervision to be reviewed by his probation officer after a

24 period of 20 years and every five years thereafter to see if

25 continued supervision is necessary and appropriate, and I think

1  that is the appropriate disposition.

2      So I'm -- let Mr. Karlberg sit for the sentencing at this

3  point and the Court finds as follows:  The offense of

4  possessing child pornography in violation of 18 U.S.C. Section

5  2252(a)(4) and (b)(2) occurred on or about April 22nd, 2013.

6  The guidelines apply.  The offense is found in 2G2.2.  Because

7  the offense involved causing minors to engage in sexually

8  explicit conduct for the purpose of producing a visual

9  depiction of that conduct or for the purpose of transmitting a

10  live visual depiction of some conduct cross reference to 2G2.1

11  is required.

12      Also pursuant to 2G2.1(d)1 since the offense involved the

13  exploitation of more than one minor part d should be applied in

14  Chapter 3 as if the exploitation of each minor had been

15  contained in a single count of conviction.  Therefore, the

16  offense conduct related to the exploitation of each minor

17  results in the addition of three groups used to derive the

18  total offense level in this case.

19      Because none of the grouping rules enumerated in 3D1.2

20  apply each count is treated as a separate group, and the

21  combined offense level is determined by taking the offense

22  level applicable to the group with the highest offense level

23  and increasing the offense level by the amount indicated in the

24  table in 3D1.4.  There are three groups and each group has a

25  base offense level of 32.  Each group has the same specific

1  offense characteristics.

2      Since the offense involved a minor who engaged -- who

3  attained the age of 12 years but not 16 the offense is

4  increased by two, and also for the purpose of producing

5  sexually explicit material or for the purpose of transmitting

6  such material live the offense involved the use of a computer

7  or interactive computer service to solicit participation with a

8  minor in sexually explicit conduct resulting in an increase of

9  two levels.  The adjusted offense level is 36.

10      The multiple count adjustment table under 3D1.4 pursuant

11  to that the offense level is increased by 3.  There's a three

12  level reduction for acceptance of responsibility.  Total

13  offense level is 36.  No criminal history points resulting in a

14  criminalistic history category of 1.  Sentencing range is 188

15  to 235 months.  The statutory maximum is 10 years.  The

16  guideline range is 120 months.  The guideline term of

17  supervised release is five years to life.  Probation is not

18  authorized.  The Court departs for the reasons stated earlier

19  to level 8, criminalistic category 1, sentencing range of 0 to

20  6 months.

21      It is the sentence of the Court the Defendant be committed

22  to the custody of the Federal Bureau of Prisons for time served

23  followed by a life term of supervised release.  Conditions of

24  supervised release are as follows:  The Defendant shall not

25  commit any crimes; federal, state, or local.  He shall not

1  possess any illegal controlled substances.  He shall abide by

2  the standard conditions of supervision recommended by the

3  Sentencing Commission.  He shall participate in a mental health

4  program approved by the U.S. Probation Office.  The Defendant

5  shall contribute to the cost of services rendered in an amount

6  to be determined by the probation officer based on ability to

7  pay or the availability of third-party payment.

8      The Court finds the Defendant presents a low risk of

9  substance abuse and suspends that requirement.  He shall not

10  possess a firearm or other dangerous weapon.  He shall

11  cooperate in the collection of DNA as directed by the probation

12  officer.  He shall participate in an approved program of sex

13  offender evaluation and treatment which may include polygraph

14  examinations.  Any refusal to submit to such assessment or test

15  as scheduled is a violation of the conditions of supervision.

16      The Defendant will be required to pay the costs of

17  treatment as directed by the probation officer.  The Court

18  authorizes the probation officer to release psychological

19  reports and other presentence reports to the treatment agency

20  for continuity of treatment.

21      The Defendant shall register as a sex offender in any

22  state where the Defendant resides, is employed, performs

23  volunteer service, carries out a vocation, or is a student as

24  required by the law.  He shall provide the probation officer

25  with access to any requested financial records -- any records

1  such as bills and invoices for credit cards, telephone, and

2  wireless communication services, television provider services,

3  and internet service providers.

4       He shall provide the probation officer with a complete and

5  current inventory of the number of computers used by the

6  Defendant along with a monthly log of computer access.  He

7  shall not use a computer that has internet access until the

8  computer use plan is developed and approved by his treatment

9  provider and/or probation officer.  Such plan at a minimum must

10  require the Defendant to submit a monthly record of internet

11  use, online screen names, encryption methods, and passwords

12  utilized by the Defendant.  He shall not access any computer

13  that utilizes any cleaning or wiping software programs.  He

14  shall consent to third-party disclosure to any employer,

15  potential employer, community service site, or other interested

16  party as determined by the probation officer if any computer

17  related restrictions that are imposed.  He shall not possess

18  images or videos depicting sexually explicit conduct involving

19  adults, child pornography or visual or text content involving

20  minors which has sexual, prurient, or violent interests as an

21  inherent purpose.

22       He shall not associate or have contact directly or through

23  a third party with persons under the age of 18 except in the

24  presence of a responsible adult who is aware of the nature of

25  the Defendant's background and who has been approved in a

1  advance by the probation officer.  Such prohibited conduct

2  shall include the use of electronic communication, telephone,

3  or written correspondence.

4      The Defendant shall avoid and is prohibited from being in

5  any areas, locations where children are likely to congregate

6  such as schools, day care facilities, playgrounds, theme parks,

7  arcades, recreational facilities, or recreation parks unless

8  prior approval has been obtained from the probation officer --

9  from the probation officer.

10     The Defendant shall allow at the direction of the

11  probation officer and at the Defendant's expense the

12  installation of monitoring hardware or software to monitor the

13  Defendant's use of a computer system, internet capable devices,

14  and/or similar electronic devices under the Defendant's

15  control.  He shall not use sexually oriented telephone numbers

16  or services.  He shall have no contact directly or through a

17  third party with the victim -- victims in this case.  Such

18  prohibited conduct shall include the use of internet, email,

19  telephone, or written correspondence.  He shall submit his

20  person and any property, house, residence, vehicle, papers,

21  computer, other electronic communication or data storage

22  devices or media and effects to search at any time with or

23  without a warrant by any law enforcement or probation officer

24  with reasonable suspicion concerning a violation of condition

25  of supervised release or unlawful conduct by the person and by

1    any probation officer in the lawful discharge of the

2    Defendant's supervision functions.  Such searches may include

3    removal of such items for purpose of conducting more thorough

4    inspection.  The Defendant shall inform the other residents of

5    the condition.  Failure to submit to a search may be grounds

6    for revocation.

7        In addition, the Court recommends that the probation

8    officer review the length of the supervision after a period of

9    20 years and every five years thereafter, and if the probation

10   officer at that point determines that supervision should be

11   terminated, the Court recommends that the probation officer

12   petition the Court for such a termination.  So that's after 20

13   years and every five years thereafter.

14       The guideline fine range is $20,000 to $200,000.  He's

15   demonstrated an inability to pay a fine.  All fines are waived.

16   Special assessment of one hundred dollars is imposed due

17   immediately.

18       Both the Defendant and the Government may have the right

19   to appeal this sentence as set forth in Title 18 U.S. Code

20   Section 3742.  If the Defendant is unable to pay the costs of

21   an appeal, he has the right to apply for leave to appeal in the

22   forma pauperis and requests the Court to appoint counsel for

23   him.  If the Defendant so requests, the Clerk of Court shall

24   prepare and file forthwith a notice of appeal on behalf of the

25   Defendant.  Notice of appeal by the Defendant must be filed

1   within 14 days of the date judgment is entered in the docket

2   pursuant to Rule 4(b) of the Federal Rules of Appellate

3   Procedure.

4        All right.  Anything further from the Government?

5            MS. MASTERSON:  Your Honor, excuse me, the Government

6   moves to dismiss the remaining counts in the indictment in the

7   interest of justice.

8            THE COURT:  That motion is granted.  Anything further

9   from the Defense?

10           MR. McCOLGIN:  Nothing further, Your Honor.

11           THE COURT:  Mr. Karlberg and -- well let me ask

12  Defense counsel.  He continues to go to Washington County

13  Mental Health?

14           MR. McCOLGIN:  Yes.  Fours days a week five hours

15  each day.

16           THE COURT:  Okay.  All right.  Thank you.

17               (Whereupon, the proceeding was

18               adjourned at 10:07 a.m.)

19               C E R T I F I C A T I O N

20       I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled  matter.

22

23                                    _____

24

25                                    JoAnn Q. Carson

1    March 5, 2015                        _____

2    Date                                 JoAnn Q. Carson, RMR,CRR

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25